UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| WILLIE J. HENDERSON, JR., ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | No. 1:05-cv-974-RLY-TAB |
| ) | |
| WISHARD MEMORIAL HOSPITAL, et al., ) | |
| ) | |
| Defendants. ) | |

**Entry Discussing Motion for Summary Judgment**

For the reasons explained in this Entry, the defendants' motion for summary judgment must be **granted.**

**I.  Background**

The plaintiff in this civil rights action is Willie Henderson, Jr. ("Henderson"), who at all relevant times was confined at the Miami Correctional Facility ("MCF"). The defendants are Wishard Memorial Hospital ("WMH") and Dr. Shane Ditty ("Ditty"), a resident in internal medicine at WMH. The action was removed to this court from the Marion Superior Court. Henderson alleges that in November 2003 the defendants were deliberately indifferent to his serious medical needs. He seeks compensatory and punitive damages. The defendants seek resolution of Henderson's claims through the entry of summary judgment.[1]

**II.  Undisputed Facts**

---

[1] "Summary judgment is appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir. 2005) (quoting Rule 56(c) of the *Federal Rules of Civil Procedure*). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.* "'It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" *Sanders v. Village of Dixmoor,* 178 F.3d 869, 870 (7th Cir. 1999) (quoting *Liberles v. County of Cook,* 709 F.2d 1122, 1126 (7th Cir. 1983)).

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(e), the following facts are undisputed for purposes of the motion for summary judgment:

On November 14, 2003, Henderson, a diabetic, was found unconscious on the floor of his prison cell. A blood test revealed that Henderson's blood sugar level was 800. A normal blood sugar level range is between 80 and 150. He was transported to WMH after first being taken to and checked at a nearby hospital in Peru, Indiana. Henderson was provided with two, thirty (30) unit doses of insulin before his arrival at WMH.

By the time he arrived at WMH, Henderson's blood sugar level was approximately 400. Initial laboratory evaluation revealed an increased anion gap metabolic acidosis, positive serum ketones, an elevated serum osmolality, an elevated blood glucose, and several additional electrolyte abnormalities including hypokalemia (low potassium), hyperchloremia (elevated chloride), and hypernatremia (elevated sodium). These findings, when combined with his clinical presentation of respiratory distress, mental status changes and unconsciousness, lead to the conclusion that Henderson was experiencing diabetic ketoacidosis ("DKA"). DKA, a potentially life-threatening complication of diabetes, is a complex metabolic state of hyperglycemia, electrolyte abnormalities, ketosis, and acidosis –resulting in dehydration, respiratory distress, altered mental status, and ultimately loss of consciousness.

Henderson was sedated because of his mental state and a breathing tube was inserted to treat his respiratory distress. Henderson was admitted to the Intensive Care Unit and was treated with aggressive fluid resuscitation, insulin therapy, and electrolyte replacement.

The progress notes reveal that on November 15, Henderson was still sedated and relying on a ventilator for breathing. By November 16, Henderson's blood sugar levels had stabilized, his dehydration resolved, and electrolyte abnormalities were improving. As the DKA resolved, Henderson's mental status and respiratory distress improved. Once Henderson was awake, alert, and breathing on his own, his breathing tube was removed. Later that day, Henderson was able tolerate an oral diet, and therefore his insulin drip was discontinued, and a regimen of subcutaneous insulin was initiated.

On November 17, 2003, defendant Dr. Ditty made the decision, in consultation with other staff physicians, that Henderson could be discharged. Henderson's blood sugar and potassium levels were normal. While Henderson's sodium and chloride levels were still slightly above normal, those levels did not require him to remain as an inpatient.

Before his discharge on November 18, 2003, Henderson was prescribed the appropriate type and amount of insulin for his condition. Additionally, Henderson was provided with diabetes education addressing how to manage his diabetes properly. That education included information about the importance of exercise and a proper diet. In fact, Henderson was apparently knowledgeable about diabetes because he had helped care for his diabetic parents.

In addition to the many tests conducted on Henderson before his discharge, his renal function was evaluated. Based upon those tests, Dr. Ditty determined that he should

2

see a kidney specialist to examine his renal function and to determine whether he was experiencing acute or chronic kidney dysfunction. That follow up appointment was set for December 2, 2003. Tests conducted on December 2, 2003, showed, among other things, that Henderson's sodium, chloride, potassium, blood sugar, and creatinine (kidney function) had returned to normal levels.

At no time in treating Henderson or making the decision to discharge him did Dr. Ditty give any consideration to the fact that he was a convicted offender. After several days of treatment, Dr. Ditty and his superiors and other members of the medicine team involved made a collective decision that Henderson's medical condition had so improved that he no longer required in-patient medical care. In making that decision, all appropriate medical information was considered and the WMH discharge guidelines were followed. Moreover, Dr. Ditty did not speak with any correctional officials about the timing of Henderson's discharge.

### III. Conclusions of Law

The Eighth Amendment's proscription against the imposition of cruel and unusual punishment provides the constitutional standard for the treatment of convicted offenders such as Henderson. *Helling v. McKinney*, 113 S. Ct. 2475, 2480 (1993). That is the pertinent constitutional provision associated with the claim in this action.

The Eighth Amendment's proscription against cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain" by the state. *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (citation and internal quotations omitted). The Eighth Amendment's proscription against the imposition of cruel and unusual punishments encompasses two forms of protection: first, prison officials may not use excessive physical force against prisoners; and second, prison officials have the duty to provide humane conditions of confinement--prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

> A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, sufficiently serious." A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a "sufficiently culpable state of mind." The officials must know of and disregard an excessive risk to inmate health; indeed they must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk. Additionally, a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005) (some quotations and internal citations omitted).

A court examines the totality of an inmate's medical care when determining whether defendants have been deliberately indifferent to an inmate's serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999). It is well-settled that while incarcerated, an inmate is not entitled to the best possible care or to receive particular treatment of his choice. *See Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir. 1997). Negligence, even gross negligence, is insufficient to establish deliberate indifference under the Eighth Amendment. *See Farmer,* 511 U.S. at 835; *Mathis v. Fairman,* 120 F.3d 88, 92 (7th Cir. 1997); *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). Henderson is "entitled to reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267.

It is undisputed that Henderson's medical condition upon arriving at WMH constituted a serious medical need. The pivotal issue is whether Dr. Ditty and WMH were deliberately indifferent.

Henderson alleges that he was discharged from WMH prematurely at the insistence of prison officials even though he continued to suffer from symptoms of DKA, renal failure, and other diabetes-related complications. This contention is not supported by the record. There is no evidence that prison officials were consulted or had any input as to how long Henderson stayed at the hospital. Furthermore, Henderson has not presented any evidence which disputes the defendants' position that he was discharged after a five-day inpatient stay because his condition improved to the point where continued hospitalization was not medically necessary. Although Henderson's chronic conditions were not and could not be "cured," there is no evidence of record showing that he required continued inpatient care at the time of his discharge.

After Henderson was released from WMH, he was placed in the prison infirmary. He asserts that on November 21, 2003, he was transported to Duke Hospital after suffering from renal insufficiency and hypernatremia, hyperchloremia, and hypokalemia. Although the unauthenticated medical records which Henderson submitted indicate that on November 21, 2003, Henderson was taken to Duke Hospital, none of those records support the inference that anything done or not done by the defendants caused any subsequent serious health problems. Indeed, the hospital record of November 21, 2003, indicates that Henderson was brought to the emergency room with complaints of elevated sodium levels and that he "remained asymptomatic without complaints throughout the emergency room visit."

Upon discharge from WMH, Dr. Ditty referred Henderson to see a kidney specialist on December 2, 2003, for follow up of his renal function. Henderson has not refuted Dr. Ditty's statement that as of December 2, 2003, tests showed that Henderson's sodium, chloride, potassium, blood sugar, and creatinine (kidney function) had returned to normal levels. Henderson has not presented any evidence which demonstrates that his serious conditions were ignored by the defendants or that the care provided him by Dr. Ditty at WMH was unreasonable, substandard or inadequate.

Dr. Ditty and the WMH staff evaluated Henderson's medical condition, provided a ventilator for breathing, aggressive fluid resuscitation, insulin therapy, and electrolyte

4

replacement. After five days of inpatient treatment, when Henderson's DKA resolved as indicated by stabilized blood sugar levels, resolved dehydration, and improved electrolyte levels, he was discharged from the hospital with the expectation that his medical conditions would be monitored at the prison. The record shows that a reasonable course of treatment was provided to Henderson, and he was released only after his conditions were improved to a level which no longer required inpatient care. In sum, Henderson has not presented evidence that creates a genuine issue of fact as to whether Dr. Ditty was deliberately indifferent to his medical needs. *Norfleet v. Webster,* 439 F.3d 392, 396 (7th Cir. 2006) ("To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."). Dr. Ditty is entitled to summary judgment.

The foregoing discussion resolves the claim against Dr. Ditty. WMH is also named as a defendant. It is well settled that § 1983 does not allow for an entity to be held liable for the acts of its agents based only on a theory of *respondeat superior. Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-94 (1978). WMH could be liable to Henderson only if WMH had a policy or widespread practice or custom of depriving inmates of constitutionally adequate medical care. *Id.*; *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001); *Billings v. Madison Metropolitan Sch. Dist.*, 259 F.3d 807, 817 (7th Cir. 2001). Henderson does not allege the existence of any such policy or custom, nor has he presented any evidence which would support such an allegation. Additionally, in *City of Los Angeles v. Heller,* 475 U.S. 796 (1986), the Supreme Court held that a local government cannot be held liable for a constitutional deprivation allegedly brought about through an official policy or custom if a determination has been made that there was no constitutional violation committed by anyone in the first place. The analysis of Henderson's claim against Dr. Ditty shows that there was no violation of Henderson's federally secured rights in connection with his treatment at and discharge from WMH in November 2003. Accordingly, WMH is entitled to summary judgment.

### IV. Conclusion

Judgment as a matter of law is appropriate when a party "fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). That is the case here. Accordingly, the defendants' motion for summary judgment must be **granted**.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date:   April 20, 2006

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana